JENNIFER J. WACHHOLZ,

    Plaintiff,

    v.                                       Case No. 20-CV-1412

KILOLO KIJAKAZI,
Acting Commissioner of Social Security[1],

    Defendant.

## DECISION AND ORDER

Jennifer J. Wachholz seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her Title II application for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed and the case is dismissed.

## BACKGROUND

On July 16, 2016, Wachholz injured her back after lifting a recycling bin full of wood. (Tr. 320.) On August 3, 2018, she filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning on July 16, 2016 due to chronic pain in the left lower back, buttocks, leg, and foot, as well as depression. (Tr. 184.) Wachholz's applications were denied initially and upon reconsideration. (Tr. 13.) Wachholz filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ")

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's appointment as acting commissioner. *See* Fed. R. Civ. P. 25(d).

on December 12, 2019. (Tr. 28–59.) Wachholz testified at the hearing, as did Leslie Goldsmith, a vocational expert. (Tr. 28.)

In a written decision issued February 4, 2020, the ALJ found that Wachholz had the severe impairments of degenerative disc disease of the lumbar spine, depression, anxiety disorder, and trauma. (Tr. 15.) The ALJ found that Wachholz did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 15–17.) The ALJ further found that Wachholz had the residual functional capacity ("RFC") to perform light work, with the following limitations: occasional stooping; unskilled work performing simple, routine, and repetitive tasks that can be performed at a flexible pace with end of the day quotas with only occasional decision-making and occasional changes in work setting. (Tr. 17–22.)

While the ALJ found that Wachholz was unable to perform her past relevant work as a healthcare worker and assembler, he determined that given her age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that she could perform. (Tr. 22–23.) As such, the ALJ found that Wachholz was not disabled from July 16, 2016, through the date of the decision. (Tr. 23.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Wachholz's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to This Case*

Wachholz argues that the ALJ erred in several ways in finding her not disabled. To begin, although the analysis is intertwined, after pulling back the layers, it appears Wachholz is making two separate arguments in sections two, three, four, and five of her brief. First, she argues that the ALJ failed to provide a proper regulatory analysis under 20 C.F.R. § 404.1520c for the four State Agency consultants' opinions, as well as for the opinion of her treating physician's assistant, Jessica Meyer. And second, she argues that the ALJ cherry-picked the record evidence regarding her symptoms of disabling back pain, both in weighing the persuasiveness of the medical opinions and in discounting her subjective symptoms. Finally,

3

Wachholz argues the ALJ evaluated two third-party statements under a rescinded Social Security Ruling ("SSR"), SSR 06-03p. I will address each argument in turn.

### 2.1 Relevant Medical History

Wachholz suffered a back injury on her alleged disability onset date—July 16, 2016. (Tr. 320.) She had "terrible" pain in her back for the next three months and then pain "on and off" for several months afterwards. (*Id.*) Her pain escalated again in March 2017 and she began seeing a chiropractor. (*Id.*) Wachholz's pain then "went back and forth" until July 2017, when it significantly increased in severity. (*Id.*) Her doctor performed an MRI, which showed a left L5-S1 herniated nucleus pulposis, stenosis, and lumbar and lumbosacral radiculopathy. (*Id.*) Wachholz underwent physical therapy from September 14, 2017 until October 19, 2017 and had two injections. (Tr. 304–22.) Wachholz's physical therapy discharge notes from October indicated that she had not seen any improvements with physical therapy and continued to have muscular tightness to the lumbar paraspinals and gluteus, more on the left. (Tr. 306.) In October, Wachholz underwent an epidural steroid injection, which provided fifty percent pain relief. (Tr. 368.)

Also in October 2017, Wachholz saw her treating orthopedist, Dr. Thomas Sylvester, who noted that she continued to have pain radiating from her low back into her left posterior thigh, calf, and foot. (Tr. 291.) Dr. Sylvester noted that Wachholz gained no significant improvement from her most recent epidural steroid injection and gained no lasting relief from home exercises, chiropractic care, nonsteroidal anti-inflammatory medications, and oral steroids. (*Id.*) As such, Dr. Sylvester recommended surgical intervention. (*Id.*)

Dr. Sylvester performed a left L5-S1 hemilaminectomy and discectomy on December 13, 2017. (Tr. 273.) Wachholz's symptoms improved post-surgery (Tr. 277, 280, 429);

however, her left lower extremity pain persisted (Tr. 277). Wachholz noted that her pain increased again the first week of February 2018, and she reported that standing for more than three hours caused an acute flare-up of pain. (Tr. 426.) Wachholz attended seven physical therapy appointments between February and April 2018 (Tr. 379–410); however, she stated in March that she thought physical therapy was making her symptoms worse (Tr. 273).

In April 2018, Dr. Sylvester noted that Wachholz had had improvement with her radicular symptoms since her March appointment, though she continued to have left buttock, posterior thigh, and left calf pain "intermittently." (Tr. 300.) By the end of the month, Wachholz reported to her treating pain management doctor, Dr. Mariam El Baghdadi, that she had fifty percent pain relief, but continued to have persistent leg pain, particularly with activity. (Tr. 334.) On May 3, 2018, Wachholz underwent a caudal epidural injection (Tr. 340), which provided no relief (Tr. 445). Dr. El Baghdadi noted that Wachholz experienced eighty percent pain relief for eight weeks after a transforaminal epidural steroid injection in October 2017; thus, she recommended having another one as it helped in the past. (*Id.*)

In June 2018, Dr. Sylvester discussed further surgical intervention going forward for recurrent disc herniation. (Tr. 296.) Wachholz noted that she did not want to undergo further surgical intervention unless her symptoms did not improve with continued injections. (*Id.*) In August, Dr. El Baghdadi noted that a transforaminal epidural steroid injection performed on July 12 (Tr. 331) provided no relief (Tr. 324). Wachholz reported continued pain with bending and twisting, particularly on the left side. (*Id.*) Wachholz expressed interest in a trial spinal cord stimulator. (*Id.*)

On September 20, 2018, Wachholz sought a second opinion from Dr. Jonathan Pond regarding her left leg pain. (Tr. 454.) Dr. Pond opined that Wachholz's continued pain may

5

relate in part to epidural fibrosis or scar tissue, that it would not respond well to surgical intervention at this time, and that Wachholz should give it more time and work on nerve flossing-type and trunk stabilization exercises. (Tr. 456.) In late December, 2018, Dr. El Baghdadi noted that Wachholz continued to experience pain with bending and twisting and they discussed the spinal cord stimulator in detail. (Tr. 473.) On March 19, 2019, the spinal cord stimulator was placed. (Tr. 496.) However, Wachholz reported only twenty percent relief in her left anterior thigh and no relief in her posterior and lateral leg and calf, her areas of primary concern. (Tr. 499.) On June 20, 2019, after noting that Wachholz had not had significant relief with interventional procedures, Dr. El Baghdadi recommended Wachholz continue doing the exercises that she learned in physical therapy as well as medication management. (Tr. 502.) Wachholz also noted that she was starting yoga. (*Id.*)

### 2.2 Evaluating the Medical Opinions Under the Regulation

Wachholz challenges the ALJ's evaluation of the medical opinion evidence under the relevant regulation—20 C.F.R. § 404.1520c. The crux of Wachholz's first alleged error is not so much the actual weight the ALJ accorded the medical opinions, but how he articulated his analysis under the regulation.

#### 2.2.1 Relevant Law

Section 404.1520c governs claims filed on or after March 27, 2017 (like Wachholz's) and states how the Administration considers medical opinions. It provides that:

> When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section). We will articulate how we considered the medical

6

opinions and prior administrative medical findings in your claim according to paragraph (b) of this section.

20 C.F.R. § 404.1520c. Section 404.1520c(c) lists the factors the Administration will consider as follows: supportability, consistency, relationship with the claimant, specialization, and any other factors which tend to support or contradict the medical opinion. *Id.* Regarding how the Administration articulates consideration of medical opinions in its decision, § 404.1520c(b)(2) states that:

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

*Id.*

### 2.2.2 Evaluation of State Agency Doctors' Opinions

Wachholz challenges the ALJ's evaluation of the opinions given by the State Agency medical consultants at the initial and reconsideration levels as to her physical impairments. (Pl.'s Br. at 4–19, Docket # 17.) Specifically, Wachholz argues that the medical opinions are subject to the amended regulation—20 C.F.R. § 404.1520c—and the ALJ failed to properly weigh the opinions using the required regulatory factors.

At the initial level, State Agency physician Dr. William Fowler opined that Wachholz was capable of performing light work with occasional stooping. (Tr. 67.) State Agency physician Dr. Jeffrey Nesta concurred with that evaluation at the reconsideration level. (Tr. 81–82.) In assessing Wachholz's RFC, the ALJ found that both Drs. Fowler's and Nesta's

opinions that Wachholz was capable of performing light work with postural limitations was supported by substantial other evidence in the record, including clinical findings and test results indicating her surgery was successful and showing only mild to moderate degenerative changes in the lumbar spine; Wachholz's nearly normal physical examinations; and Wachholz's description of her activities of daily living including caring for herself independently, performing household chores, driving, shopping, and gardening. (Tr. 20.)

Wachholz is correct that the language of § 404.1520c(b)(2) indicates that because consistency and supportability are the most important factors the ALJ will consider when evaluating a medical opinion, an explanation as to how the ALJ considered these factors must be included in the opinion. This requirement is in contrast to the remaining factors, in which the regulation provides that the Administration "may, but [is] not required to, explain how we considered" the remaining factors as appropriate. *Id.*

Wachholz argues, however, that the ALJ not only failed to properly explain the required consistency and supportability factors, but he also failed to address any of the remaining factors in his opinion. I disagree. As an initial matter, it is helpful to articulate the difference between supportability and consistency. Supportability addresses the extent to which the medical opinion is explained by the provider and supported by objective findings. *See* 20 C.F.R. § 404.1520c(c)(1); *see also Morton v. Saul*, No. 2:19-CV-92 RLW, 2021 WL 307552, at *7 (E.D. Mo. Jan. 29, 2021) ("In other words, an opinion is more persuasive if it presents more relevant objective medical evidence and explanatory rationale in support of the opinion."). Whereas consistency addresses the extent to which a medical opinion is consistent with the record evidence as a whole, including evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2); *see also Morton*, 2021 WL 307552, at *7 ("Stated more

simply, an opinion is more persuasive if it is more consistent with the overall evidence as a whole.").

Although in evaluating Drs. Fowler's and Nesta's opinions the ALJ only uses the word "supported," it is clear that the ALJ considered both how the opinions are supported by the objective evidence and how the opinions are consistent with the record as a whole. Again, the ALJ stated that the doctors' opinions were supported by "substantial other evidence in the record" including clinical findings and test results, normal physical examinations, and Wachholz's reported activities of daily living. (Tr. 20.) Because State Agency physicians conduct a paper review of the record as opposed to actually examining the claimant, the State Agency physician cannot support his opinion with objective medical findings that he created himself (i.e., imaging ordered, laboratory tests conducted). Rather, the State Agency physician must base his opinion on the objective evidence created by the claimant's treating or examining providers.

In this case, both State Agency physicians considered the objective evidence in rendering their opinions, including imaging and Wachholz's physical examinations. (Tr. 63–64, 82–83.) The ALJ then found the opinions supported by the clinical findings and test results. (Tr. 20.) This properly explains the opinions' supportability. The ALJ further explained that the doctors' opinions were supported by Wachholz's nearly normal physical examinations, her description of daily activities, and the medical evidence showing mild to moderate degenerative changes in the lumbar spine. (*Id.*) This explains the opinions' consistency with the record evidence as a whole.

Wachholz also criticizes the ALJ for not addressing the remaining regulatory factors such as the relationship with the claimant and specialization, but given these are opinions by

9

State Agency consultants, these factors are fairly obvious. It is well known that State Agency consultants perform a paper review of the claimant's file and thus do not have a treating relationship with the claimant. And as to expertise, the regulations specifically provide that in evaluating a State Agency consultant's opinion under § 404.1520c, the ALJ can consider the fact that the Administration's "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). Thus, it is unclear why the ALJ would need to specifically address these factors when the information regarding State Agency consultants is so well known.

Finally, Wachholz asserts, without regulatory citation, that in performing this evaluation, "the ALJ must outline specific medical evidence which contradicts or supports the opinions." (Pl.'s Br. at 8–9.) To the extent Wachholz asserts that the regulations require the ALJ to provide a record citation after each piece of evidence, there is no such requirement. Furthermore, in this case, the ALJ *does* provide record citations to the stated evidence in the opinion, even if he did not repeat them in his analysis of the consultants' opinions.

For these reasons, I find the ALJ did not err in his regulatory evaluation of the State Agency physicians' opinions.

### 2.2.3 Evaluation of State Agency Psychologists' Opinions

Wachholz also challenges the ALJ's evaluation of the opinions given by the State Agency consultants regarding her mental impairments. State Agency consultant Frank Orosz, Ph.D opined at the initial level that Wachholz had moderate limitations in concentration, persistence, or pace (Tr. 65) and was capable of completing one to three step tasks, given routine breaks and was capable of unskilled work (Tr. 69–70). At the reconsideration level, State Agency consultant Russell Phillips, Ph.D agreed that Wachholz had moderate

10

limitations in concentration, persistence, or pace (Tr. 79), and opined that Wachholz could maintain attention for two hours at a time and persistent at simple tasks over eight– and forty– hour periods with normal supervision; could tolerate simple changes in routine; avoid hazards; travel independently; and make/carry out simple plans (Tr. 84).

In assessing Wachholz's RFC, the ALJ found both Drs. Orosz's and Phillips' opinions persuasive because Wachholz's symptoms were not severe enough to require hospitalization; the evidence showed good response to treatment, including medication; and her mental status examinations were generally normal. (Tr. 20.)

Wachholz makes the same argument as to the ALJ's analysis of the State Agency psychological consultants' opinions as she does for the doctors' opinions. But again, the ALJ specifically articulates how the opinions are supported by the objective findings, in this case, the normal mental status examinations, and explains how the opinions are supported by the record evidence showing good response to treatment, including medication. (Tr. 20.)

Thus, to the extent Wachholz argues for remand based on the ALJ's alleged failure to provide a proper regulatory analysis for the State Agency psychologists' opinions, I find the ALJ did not err.

### 2.2.4 Evaluation of PA-C Meyer's Opinion

Wachholz also argues the ALJ erred in his assessment of the opinion of Wachholz's treating physician's assistant, Jessica Meyer. Wachholz treated with Meyer throughout the relevant time period for her low back pain and other medical issues such as high blood pressure. (*See* Tr. 352, 411, 417, 505, 518, 522.) In January 2019, Meyer's notes indicate that Wachholz requested Meyer complete a functional assessment form for her disability appeal. (Tr. 518.) Meyer explained that she cannot "objectively fill out her paperwork" and would

11

Case 1:20-cv-01412-NJ   Filed 03/15/22   Page 11 of 19   Document 22

refer Wachholz for a functional capacity evaluation. (*Id.*) Meyer explained that such an evaluation would answer the questions asked on the form, as Meyer "cannot comfortably fill out the form for her." (*Id.*)

Wachholz underwent the functional capacity evaluation on February 25, 2019. (Tr. 476.) The evaluator noted that Wachholz could occasionally lift up to thirteen pounds, stand, and squat. (Tr. 479.) However, the evaluator also noted that Wachholz self-limited on forty-five percent of the eleven tasks due to pain and in the evaluator's experience self-limiting on more than twenty percent of the tasks tends to indicate psychosocial and/or motivational factors affecting the test results. (Tr. 476.)

Utilizing the results from the functional capacity evaluation, Meyer completed a Medical Opinion form on March 7, 2019, opining that Wachholz could lift ten pounds occasionally, stand and walk about three hours, sit about two hours, and shift positions at will. (Tr. 485.) She opined that Wachholz could occasionally twist, stoop, crouch, and climb ladders, citing the functional capacity evaluation as support for the opinion. (Tr. 486.) Finally, Meyer opined Wachholz would miss more than four days per month due to her impairments or treatment. (*Id.*)

The ALJ found Meyer's opinion less persuasive for "several reasons," including the fact she relied on the functional capacity evaluation which could not accurately determine Wachholz's work level due to her self-limiting behavior; the opinion's inconsistencies with the clinical findings and test results in the record, including the nearly normal physical examination findings; and the opinion's inconsistency with Wachholz's description of her activities of daily living. (Tr. 21.)

Wachholz again argues that the ALJ improperly assessed Meyer's opinion by insufficiently analyzing the regulatory requirements, specifically, her treatment relationship and specialization. (Pl.'s Br. at 19–20.) Wachholz acknowledges, however, that the ALJ *did* analyze supportability and consistency (*id.* at 20), and, as explained above, the ALJ is not required by the regulations to specifically articulate the remaining factors. Furthermore, while Wachholz did have a treating relationship with Meyer, it is not clear what particular specialization Wachholz alleges Meyer possesses to assist in assessment of her lower back pain. Again, to the extent Wachholz challenges the ALJ's explanation of how he analyzed the regulations, I find no error.

### 2.3 Cherry-Picking of the Evidence

Interwoven within Wachholz's arguments regarding the ALJ's evaluation of the medical opinions is an assertion that the ALJ cherry-picked the evidence favorable to a finding of non-disability when addressing his analysis. Wachholz also argues in a separate section of her brief that the ALJ's summary of the record as a whole does not correct the deficiencies in his analysis of the provided expert opinions. (Pl.'s Br. at 24–26.)

An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). An ALJ need not, however, mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion. *Id.*

As to her physical impairments, as summarized above, the records shows that after sustaining an injury on July 16, 2016, Wachholz slowly saw an escalation in left low back pain causing her to seek more aggressive treatment in July 2017. (Tr. 320.) An MRI showed

13

that Wachholz had a left L5-S1 herniated nucleus pulposis, stenosis, and lumbar and lumbosacral radiculopathy (*id.*) and she eventually underwent surgery in December 2017 (Tr. 273). While Wachholz did see rather significant improvement after the surgery (on January 29, 2018 she reported having fifty percent pain relief, Tr. 429), as in many such cases of lumbar pain, the initial level of relief from surgery was not permanent. By the end of the relevant treatment period, Wachholz's treating pain management doctor recommended that because she failed to obtain significant relief with interventional procedures and because Dr. Pond opined that further surgery was not recommended at that point, she simply continue with the exercises she learned in physical therapy and continue with medication management. (Tr. 502.)

Wachholz argues the ALJ cherry-picked the record by overstating the success of her back surgery and the relief obtained through the spinal cord stimulator; ignoring the abnormal examination findings, such as positive or equivocal straight leg raise on the left, decreased strength, and paraspinal tenderness; and overlooking abnormal imaging subsequent to the surgery. (Pl.'s Br. at 16–19, 21, 24–25.) She argues the ALJ relied too heavily on her activities of daily living, ignoring her statement that she performs the tasks slowly throughout the week. (*Id.* at 16–19.)

But this is not what the ALJ did. On the contrary, the ALJ acknowledges that despite having "some improvement" after surgery, Wachholz continued to experience pain in her low back and left leg. (Tr. 18.) The ALJ cited the MRI findings subsequent to the surgery showing lumbar spondylosis changes, especially at L5-S1, with diffuse disc protrusion mildly and postsurgical changes at L5-S1 with enhancing scar. (*Id.*) The ALJ noted that her physical examination findings were "nearly normal," specifically stating she had an "equivocal"

14

straight leg raise test on the left. (*Id.*) The ALJ also specifically noted that Wachholz states she performs "some" household chores, "but breaks them up throughout the week." (Tr. 19.) While Wachholz disagrees with how the ALJ analyzed the record, I do not find that the ALJ cherry-picked the evidence supporting his conclusion.

The same can be said as to her mental impairments. Again, Wachholz argues the ALJ improperly cited records showing she experienced a generally good response to treatment and relatively normal mental status findings, when certain records showed abnormal mental status findings, such as depressed mood, fatigue, early awakening, difficulty controlling worry, and obsession. (Pl.'s Br. at 12–13.) But the ALJ found that her mental health records were "relatively normal," also citing records showing she was depressed, anxious, and tearful. (Tr. 19.) Furthermore, as the ALJ cited, Wachholz testified that at the time of the hearing, she was not taking any psychotropic medication or engaging in any mental health treatment. (*Id.*)

Wachholz further argues that the two State Agency psychologists' opinions were inconsistent with each other because Dr. Phillips opined an additional limitation related to changes in the work setting and because the two doctors did not opine limitations for social anxiety and self-isolation, despite the record showing social anxiety. (Pl.'s Br. at 14–15.) But the ALJ incorporated Dr. Phillips' additional limitation, limiting Wachholz to a job with only occasional changes in work setting. (Tr. 17.) And the ALJ sufficiently explains and supports his determination that Wachholz had only mild limitations in interacting with others. (Tr. 16.) Thus, she does not show that the ALJ erred in this regard.

In short, while Wachholz argues that the ALJ cherry-picked the record, I disagree. The ALJ thoroughly summarized and addressed the record as a whole. He acknowledged that while the surgery was helpful, her pain did not go away and her pain warranted work-

15

Case 1:20-cv-01412-NJ   Filed 03/15/22   Page 15 of 19   Document 22

related limitations, which he provided in the RFC. (Tr. 19.) The ALJ properly built a logical bridge from the evidence to his conclusion in this case. Thus, he did not err in this regard.

### 2.4 Evaluation of Third-Party Statements

Wachholz provided two third-party statements in support of her disability application: a statement from her daughter, Ally Wachholz (Tr. 225–32) and from her friend, Michael Bertsche (Tr. 257). Wachholz's daughter stated that Wachholz had difficulty lifting heavy things, sitting in the car for very long, and walking down the front stairs. (Tr. 225.) She stated that her mother's surgery and medications did nothing to help her pain. (*Id.*) Her daughter stated that while Wachholz can cook, clean, and do laundry, it takes her longer than usual and she has difficulty lifting and bending. (Tr. 227.)

Bertsche stated that he has known Wachholz for twelve years and while she had always been a hard worker and enjoyed house and yard work, her back problems made those activities impossible. (Tr. 257.) He stated that her life "has been very painful and emotional [sic] upsetting because she's not able to do these thing [sic] anymore." (*Id.*) Bertsche stated that Wachholz was unable to stand or sit for long periods of time and that she received no relief from the back surgery and "all the other steps recommend by the doctors." (*Id.*)

The ALJ stated that he considered these two statements under Social Security Ruling 06-03p and found both opinions somewhat persuasive. (Tr. 21.) Specifically, the ALJ found that the parties' first-hand observations of Wachholz's activities and avoidance of activities, as well as changes in behaviors and routine, were "at least somewhat consistent with the evidence in the record." (*Id.*) However, the ALJ found that to the extent the third parties were offering reports of how Wachholz was feeling, the statements were not persuasive because they were based on Wachholz's subjective reports. (*Id.*)

16

SSR 06-03p addressed how the Administration considered opinions and evidence from sources who are not "acceptable medical sources." However, this ruling was rescinded effective March 27, 2017. Now, for claims filed on or after March 27, 2017 (again, like Wachholz's), 20 C.F.R. § 404.1520c provides that all medical sources, not just acceptable medical sources, can provide evidence that is considered and evaluated by the ALJ. SSR 16-3p provides that other sources, such as family and friends, may provide information "from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms." The updated ruling provides that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."

Beyond noting that the ALJ cited the rescinded regulation and arguing that this, in itself, shows that the decision is not supported by substantial evidence, (Pl.'s Br. at 27), Wachholz has not demonstrated that the ALJ erred in his assessment of these two third-party statements. While the ALJ cited the wrong regulation, his analysis was consistent with SSR 16-3p. The ALJ did consider the personal observations of Wachholz's daughter and friend and evaluated those observations for consistency with Wachholz's statements. In doing so, the ALJ found the third-party statements somewhat persuasive. Wachholz faults the ALJ for not finding persuasive the third-party "hearsay" statements each made regarding Wachholz's symptoms because it "discounts the fact that a third-party could observe wincing, crying, or protective actions which commonly indicate pain." (Pl.'s Br. at 28.)

But there is a difference between a third-party's observation, say, of the claimant engaging in pain behaviors, and the third party simply parroting what the claimant tells him.

17

SSR 16-3p states that the ALJ should consider the third party's *personal observations* of the claimant and evaluate them in terms of how consistent *those observations* are with the *individual's statements about his or her symptoms*. Personal observations are decidedly more helpful than a third-party sharing what the claimant told him about her symptoms. And that is exactly what the ALJ did in this case. He considered the third-party's observations of Wachholz's behavior, routines, activities, and activity avoidance and found the statements somewhat persuasive, but found the third-party's reports of "what [Wachholz] is feeling" not persuasive because the statement is simply a repetition of Wachholz's subjective reports. Despite citing the wrong SSR, the ALJ's analysis of the two third-party statements was entirely consistent with SSR 16-3p, and Wachholz has failed to show otherwise. Thus, remand is not required on this ground.

## CONCLUSION

Wachholz argues that the ALJ erred in denying her disability claim. I find the decision is supported by substantial evidence and affirm. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of March, 2022.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge